IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| In Re: | Case No. 23-17771 |
| ERIN HELENE WHIBLEY, | (Chapter 7) |
| Debtor. | |
| SHANE A. SHUMA, | Adversary No. 24-00038 |
| Plaintiff, | |
| vs. | |
| ERIN HELENE WHIBLEY, | May 22, 2025 |
| Defendant. | Greenbelt, Maryland |

**VIRTUAL JUDGE'S RULING**

**(53)** Amended Complaint filed by Plaintiff Shane A. Shuma

**(58)** Answer to Complaint filed by Defendant Erin Helene Whibley

BEFORE: THE HONORABLE LORI S. SIMPSON, Judge

APPEARANCES:

ROBERT GROSSBART, Esq.
Grossbart, Portney & Rosenberg
100 North Charles Street, 20th Floor
Baltimore, MD 21201
On Behalf of the Plaintiff

JUSTIN P. FASANO, ESQ.
McNamee Hosea, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, Maryland 22070
On Behalf of the Debtor/Defendant

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

fb



APPEARANCES (Contd.)

| | |
|---|---|
| Audio Operator: | Gloria Bellman |
| Transcription Company: | CompuScribe<br>P.O. Box 789<br>Cheltenham, Maryland 20623-9998<br>(301) 577-5882 |

P R O C E E D I N G S

(Whereupon, at 10:18 a.m., the hearing began.)

THE CLERK: Silence, please, and come to order. The United States Bankruptcy Court for the District of Maryland now resumes its regular session, the Honorable Lori S. Simpson presiding over this video conference hearing.

On the 10 o'clock docket the Case of Erin Helene Whibley, Case No. 23-17771 in the main case. This matter is for the Adversary Shuma versus Whibley, Adversary No. 24-00038. Counsel, please identify yourself and your client for the record, beginning with the Plaintiff's counsel.

MR. GROSSBART: Good morning, Your Honor. Robert Grossbart, on behalf of Shane Shuma.

I apologize about being late. It was my technical ignorance, and I figured it out. My client, on the other hand, I don't have an answer for, although he did register yesterday. I haven't an opportunity to reach out to him because I was focusing on my personal challenges to get on.

THE COURT: Well, Mr. Grossbart, we have all been waiting about 20 minutes, and the time to have reached out to your client would have been at 9:30, not 10:00 when the hearing is supposed to start. I mean, it is an oral ruling. The client's presence isn't required. So I think that you would certainly be capable of conveying to him, you know, the decision of the Court.

But I don't -- everybody has been waiting quite a while. If it had just been five minutes, I would give him a little more time. But it has been --

MR. GROSSBART: I thought it was similar to other Zoom hearings with the Court. I didn't realize -- I didn't realize, Your Honor, the protocol that --

THE COURT: We all do registrations, and that gives the court a good record of who has attended and who hasn't. but that is neither here nor there as far as today is concerned.

All right. Let me hear the rest of the identifications of the parties.

MR. FASANO: Good morning, Your Honor. Justin Fasano for the Defendant and Debtor, Erin Whibley.

THE COURT: And good morning to you, Mr. Grossbart.

MR. GROSSBART: Good morning, Your Honor.

THE COURT: On April 23rd, 2025, this adversary proceeding came before the Court for a trial on the merits. The Court has jurisdiction under 28 USC Section 157, 28 USC Section 1334. This is the core proceeding, 28 USC Section 157(b)(2). Venue was proper, 28 USC Section 1409(a).

The following constitutes the Court's findings of facts and conclusions of law in accordance with Federal Rules of Civil Procedure 52, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedures 7052.

This adversary proceeding highlights the unfortunate consequences when youthful indiscretion intersects digital permanence. The relevant actions of the parties occurred while both were only teenagers, yet the negligent consequences of their imprudent actions have followed them into adulthood and may linger even longer.

At age 16 Plaintiff enrolled at Dickinson College, a small liberal arts college in Carlisle, Pennsylvania. That year, in a foolish effort to ingratiate himself to a group of peers, Plaintiff agreed to appear in a video entitled "Reasons Why the Holocaust Was a Good Thing," wherein Plaintiff read a list of purportedly positive aspects of the Holocaust.

Despite his youthful ignorance, Plaintiff knew enough to know that his repugnant statements would not be well received if the video was made public. So Plaintiff insisted that it not be shared publicly. As such things so often do, the video resurfaced a few years later on a video sharing service available to Dickinson students.

As more and more of the students viewed the video, outrage mounted against the Plaintiff. Dickinson students began circulating a number of rumors and disparagements against Plaintiff, labeling him a bigot, antisemite and Nazi. The Plaintiff was socially ostracized and his parents' home was even vandalized.

On February 22nd, 2021, a Dickinson professor opened

her regularly scheduled class to a discussion of the video. While the professor may have had good intentions, this open discussion of Plaintiff and the video fanned the flames of outrage growing on campus. During the discussion Defendant's classmate stated that she and people she knew had reported Plaintiff for Title IX behavior or just Title IX in general.

In the parlance of Dickinson students, Title IX is a euphemism for sexual assault. All evidence before the Court establishes, and Defendant does not dispute, that the classmate's statements were not true. Perhaps because of Defendant's naiveté, biases and prejudices or because the classroom context lent the discussion an air of credibility, the Defendant did not dismiss her classmate's comments as idle gossip or seek to investigate further. She simply believed them.

The following day Defendant drafted and published an online position on change.org seeking to pressure the Dickinson administration into expelling Plaintiff from the college. In addition to rebuking Plaintiff for his statements in the video, Defendant stated in the petition that Plaintiff has also been reported multiple times for Title IX issues and had written racially charged articles in the Dickinstonian, the college newspaper.

The phrase racially charged in one sense appears to be a code word for racist. That said, it is nebulous to the

point of meaningless and appears to reflect the sensitivities and suspicions of the speaker more than the content described.

However, Defendant's statement that Plaintiff had been reported multiple times for sexual assault was an objectively false statement of fact. After calling for Plaintiff's expulsion, the Defendant concluded her statements with a call to action saying, "We can longer accept a slap on the wrist as an acceptable punishment for this serial offender."

On February 24, 2021, the local ABC affiliate, WHTM, published an article about the video and the response by the Dickinson community. The article does not mention Defendant's petition, but includes an anonymous statement by a group of students rebuking Plaintiff for the video. The anonymous statement also stated that Plaintiff authored numerous inflammatory columns in the college newspaper.

The anonymous statement further alleges that the video was not the first time Plaintiff had made such statements, but it was merely the first time such comments were caught on film. Neither the ABC article nor the anonymous statement contained therein make any mention of any sexual assault allegations against Plaintiff.

On February 26th, 2021, the Dickinstonian also published an article about the video. The article mentioned the college administration's investigation into Plaintiff and

includes comments from several students angered over the video and calling for Plaintiff to be punished. The articles does not contain any reference to sexual assault allegations against Plaintiff. Defendant is neither quoted nor named in the article; however, the bottom of the article mentions Defendant's petition and provides the hyperlink to it.

On or about March 8th, 2021, George Stroud, the Dean of Students for Dickinson College, contacted the Defendant and informed her that no Title IX reports or petitions had been filed against the Plaintiff.

On or about March 10th, 2021, the Defendant amended her online petition to remove the statement that Plaintiff had been reported for "Title IX issues." Defendant added a note at the bottom of the petition acknowledging that she had been informed that Plaintiff had not been in violation of any Title IX statute.

She further stated that she did not wish to slander Plaintiff, but rather, to share what she had heard from her peers. Notably, Defendant did not alter her call to action in the petition, continuing to refer to Plaintiff as a serial offender.

In the midst of all this Plaintiff faced significant consequences. As reflected in the news articles, Plaintiff was a pariah on campus; his social life evaporated. He received numerous threats and was a victim of vandalism.

Plaintiff experienced professional repercussions as well. He lost his position as a writing fellow and tutor, was fired from his position as a staffer with a member of the State House of Representatives. In each instance Plaintiff was given no reason or vague reason for the termination.

Plaintiff also incurred significant legal expenses, including $40,000 to Reputation Defender, $17,000 to Allen Harris, PLLC, $22,296.22 TO Earl Combs, P.C.; Plaintiff incurred at least $37,000 in legal expenses related to this adversary proceeding.

On December 28th, 2021, Plaintiff filed a complaint against Defendant in the Court of Common Pleas of Cumberland County, Pennsylvania, seeking damages for defamation and false light invasion of privacy. On Mach 23, 2023, the state court entered a default judgment in favor of Plaintiff and against Defendant in the amount of zero dollars.

Shortly thereafter Plaintiff moved the state court reassess damages and set a damages trial. The state court set a damages trial for October 31, 2023. On October 27, 2023, Defendant filed her voluntary Chapter 7 petition in the underlying bankruptcy case.

The filing of the underlying bankruptcy case halted the state court action and prevented the damages trial from proceeding. In the schedule attached to her petition she listed a $75,845 debt to Plaintiff for defamation. The debt

was not originally scheduled as contingent, unliquidated or disputed. However, Defendant later filed amended schedules listing the debt as contingent, unliquidated and disputed. On December 11, 2024, the Chapter 7 trustee filed a report of no distribution.

On February 8, 2025, the Court entered the order of discharge, granting the Defendant a discharge under 11 USC Section 727. Prior to the entry of Defendant's discharge, on February 3, 2025 Plaintiff filed a complaint to determine dischargeability of debt pursuant to Section 523(a)(6) in this adversary proceeding.

Therein Plaintiff asserted a single cause of action against Defendant, asserting that the defamation debt was for willful and malicious injury and thus non-dischargeable under Section 523(a)(6). Shortly thereafter Plaintiff filed his first amended complaint asserting the same single cause of action. Defendant filed an answer to the first amended complaint on March 4 and filed a motion for summary judgment on July 24, 2024.

The Court entered the order denying the motion for summary judgment on November 1, 2024. Thereafter, Defendant filed a motion to reconsider, which was denied, and Plaintiff filed a motion for leave to file a second amended complaint, which was granted.

The Plaintiff filed a second amended complaint on

December 6, 2024, which asserts the same single cause of action as the previous complaints, but includes a request that this Court award him damages.

This proceeding came before the Court, as I indicated, on April 23, 2025, at which time the Court admitted evidence and heard the testimony of both parties. Following the trial the Court take the matter under advisement.

This adversary proceeding comes before the Court in somewhat of an odd procedural posture with respect to the underlying debt. While liability was conclusively established by the state court's default judgment, the amount of damages was in limbo at the time the state court action was halted by the automatic stay.

While Plaintiff has requested that this Court determine the amount of damages, such request raises some concern. First, the Rooker-Feldman Doctrine prevents this Court from sitting in review of the state court's damages award. Second, while it is clear that Plaintiff's underlying debt is for defamation, Plaintiff has not provided this Court with any legal standard for the measure of damages for defamation under Pennsylvania law.

This is especially important since the bulk of Plaintiff's alleged damages are attorneys' fees, which under the American rule are not recoverable. Plaintiff has not cited and the Court is not aware of any authority that an

exception to this rule applies in this instance.

Finally, it is clear that Plaintiff suffered negative consequences from the fallout of his video becoming public. The evidence before the Court shows that those negative consequences were primarily or exclusively caused by Plaintiff's statements in the video and the public reaction thereto.

As between the parties in this case, it is Plaintiff, not Defendant, who must rightfully bear those consequences. The evidence did not show that those negative consequences, excluding some portion of the attorneys' fees, at all related to Defendant's false statement that Plaintiff had been reported for sexual assault.

In light of these concerns and in the interest of judicial economy, the Court will initially focus on the question most clearly before it, the question of dischargeability. 523(a)(6) of the Bankruptcy Code provides that a debt for willful and malicious injury by the Debtor to another entity or to the property in another entity is not dischargeable.

The Supreme Court has held that the section's word willful modifies the word injury, indicating that non-dischargeability takes a deliberate takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.

Kawaauhau vs. Geiger, 523 US 57, 1998. "The party challenging the dischargeability of a debt bears the burden of proving the debt non-dischargeable by a preponderance of the evidence."

In Re: Mews, 923 Fed 3rd, 377 at 384, 4th Circuit 2019. In the order denying motion for summary judgment the Court set forth the legal standard when applying 523(a)(6) to a debt for defamation.

In lieu of recounting that analysis here, the Court will incorporate it by reference herein and restate the ultimate conclusion that the evidentiary burden on Plaintiff in this proceeding is to prove, by a preponderance of the evidence, that Plaintiff acted in knowing disregard of the falsity of her defamatory statement.

Based on the Court's finding of fact previously set out, Plaintiff did not meet that burden. The preponderance of evidence establishes that Defendant believed her classmate's untrue statements that Plaintiff had been reported for sexual assault multiple times.

When she learned of the falsity of her statement, she made a good faith effort to recant it by amending the petition, even acknowledging her mistake in a footnote to the petition. As the Defendant continuing to label Plaintiff as a serial offender in the amended petition, the evidence does not preponderate in favor of a finding that the label serial

offender should be interpreted as serial sexual offender or the like.

Instead, reviewing the petition and amended petition in their entirety together with the evidence of the general climate at Dickinson in reaction to the video, it appears that Defendant and others held the opinion that Plaintiff was someone who repeatedly stoked racial tensions and that the video was merely the most egregious and inexcusable in a series of such offenses. The bulk of the original petition conveys that Defendant believed that Plaintiff repeatedly expressed thoughts and opinions that should not be allowed to be expressed at Dickinson.

The statement in the original petition regarding Title IX reads as an unrelated aside. The upshot of the original petition is that Defendant wants Plaintiff removed from Dickinson because she believes that he is a bigot and that she does not feel safe with Plaintiff on campus. Nowhere else in the original petition does Defendant label Plaintiff a racist, misogynist or the like. In fact, Defendant states that the reason she does not feel safe with Plaintiff on campus is not because she is a female, but because she is a Jewish student.

The label serial offender should be read to mean one who has repeatedly expressed, either explicitly as in the video or implicitly, racially or ethnically insensitive

statements or viewpoints that then Defendant found offensive. As such, Defendant's retention of the serial offender language in the amended petition was not intended to and did not maintain Defendant labeling of Plaintiff as a sexual abuser.

At the hearing Plaintiff's counsel argued that knowing disregard of falsity was not the prepared standard in this context, but that a defamation debt should be held non-dischargeable if the false statements were made with reckless disregard of truth or falsity.

In support of his argument counsel cited the Supreme Court's decision in Herbert v. Lando, 441 U.S. 153, 1979. The Herbert decision does not address dischargeability, but sets forth the actual malice standard for defamation claims by public figures. In this context the Supreme Court held that actual malice required a showing of knowledge that it was false or with reckless disregard of whether it was false or not. See the Herbert decision at 156.

With respect to the reckless disregard element the Supreme Court explained that defendant in fact entertained serious doubts as to the truth of his publication such that such objective awareness of probable falsity may be found if there are obvious reasons to doubt the voracity of the informant or the accuracy of his report.

For the reasons explained shortly, this is not the correct standard for non-dischargeability under Section

523(a)(6). However, even if the Court were to apply Herbert's actual malice standards here, the evidence does not satisfy that standard. The evidence shows that Defendant did not at all entertain doubt as to the truth of her classmate's statement.

Further, the evidence does not establish that there are obvious reasons to doubt the voracity of the classmate. In fact, Defendant reliably testified that she did not believe her classmate to be a liar.

In a later decision the Supreme Court that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of Section 523(a)(6). See Kawaauhau vs. Geiger, 523 U.S. 57 at 64, 1998. Additionally, courts have continually applied the Kawaauhau holding when considering the dischargeability of a defamation debt.

In In Re: Hunter, 610 Bankruptcy Reporter 479, Bankruptcy Middle District of North Carolina 2019, after finding that plaintiff had sufficiently pled a defamation claim under state law, the Court considered whether plaintiff had adequately alleged the non-dischargeability of such claims under Section 528(3)(6). And the Hunter Court held plaintiff plausibly pled actual malice under -- plausibly pleaded actual malice under California law, but actual malice is a broader scienter requirement than that found in willful and malicious under 523(a)(6).

To demonstrate actual malice under California defamation law a plaintiff must show defendant's knowledge of the falsity of the statements demonstrating hatred or ill will towards the plaintiff; or two, lack of reasonable grounds for belief in the truth of the publication, thus demonstrating reckless disregard of the plaintiff's rights.

In comparison, a debt arising from an injury attributable to reckless conduct does not satisfy the willful and malicious requirement of 523(a)(6). See Hunter at 150 to 151.

Ultimately the Hunter Court concluded while plaintiff's allegations that defendant made his statements recklessly and in knowing disregard of their truth may be sufficient to obtain a judgment for defamation under California law, that mental state does not plausibly allege an intent to injure sufficient to render that judgment non-dischargeable under 523(a)(6)

the Eastern District of Virginia had a similar holding in In Re: Basil, 218 Westlaw 1886571, Bankruptcy Eastern District of Virginia, 2018, when it held that under Virginia law a plaintiff may recover for defamation if the publication was false and defendant either knew it to be false or believing it to be true lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based.

Negligent behavior does not satisfy the willfulness requirement of Section 523(a)(6), and the Court has no evidence of whether the Virginia Court found intentional behavior or whether it found negligent behavior; therefore, the Court held it could not find that the plaintiffs had proven non-dischargeability of the defamation claim under Section 523(a)(6).

Based on the foregoing, this Court holds that the burden on Plaintiff was to show by a preponderance of the evidence that the Defendant acted in knowing disregard of the falsity of her defamatory statements. Plaintiff did not satisfy this burden.

The Court finds and concludes that Defendant's debt to Plaintiff is dischargeable and will enter judgment against Plaintiff for Defendant in this adversary proceeding.

At trial Plaintiff's counsel mentioned that his client desired certain language in the court order resulting from the trial. While the Court rules against Plaintiff, the Court's findings may be consistent with the language desired by Plaintiff. Accordingly, the Court will ask the Plaintiff to prepare a proposed order, which the Court will consider.

Thank you. I hope you all have a good weekend, and you are accused.

Mr. Grossbart, if you will work on the order and circulate it to Mr. Fasano, and we will go from there.

MR. GROSSBART: Is there a time constraint, Your Honor?

THE COURT: Ten days. If we can get it done in 10 days, that would be great.

MR. GROSSBART: I would ask for more because my client is not here, and I have to order a copy of the transcript. I don't know the turnaround time for that.

Would it be fair to ask for 30 days so I can at least get the transcript and have an opportunity to read and look at the cases that Your Honor has mentioned?

THE COURT: Okay. And then get the order to Mr. Fasano and then we will take a look at it. We will see the order in 30 days.

MR. GROSSBART: Okay. Thank you very much, Your Honor.

MR. FASANO: Thank you, Your Honor.

THE COURT: You all have a nice weekend.

MR. GROSSBART: You as well.

THE CLERK: The Court is adjourned.

(Whereupon, at 10:44 a.m., the hearing concluded.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the provided electronic sound recording of the proceedings in the above-entitled matter.

/s/ Fabiana Barham

Fabiana Barham
Certified Transcriber
Certification No. CET-1214

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Greenbelt**

In re: Case No.: **23−17771 − LSS** Chapter: **7** Adversary No.: **24−00038**

**Erin Helene Whibley**
Debtor

**Shane A. Shuma**
Plaintiff

vs.

**Erin Helene Whibley**
Defendant

## NOTICE OF REQUIREMENT TO REVIEW TRANSCRIPT

A transcript of a hearing held in this case was requested and has been received by the Court. The transcript is available for review at the Clerk's Office or copies may be purchased from the transcriber. Each party's attorney is required to review the opening and closing statements made on behalf of the represented party, any statements made by the party and the testimony of any witness called by the party. If a party is self−represented, the party needs to perform this review himself/herself. You have seven (7) days from the date of this notice to file a Notice of Intent to Request Redaction with the Court, stating your intent to request redaction of sensitive private information before the transcript is made electronically available to the public, pursuant to the privacy policy of the Judicial Conference of the United States. The privacy policy is available on the U.S. Court's website, www.uscourts.gov, under Rules & Policies.

Examples of personal identification information which should be redacted include all but the last four digits of social security or taxpayer identification numbers, all but the last four digits of account numbers, all but the initials of minor children, and all but the year of birth.

Pursuant to LBR 9037−1, if you intend to request redaction of the transcript:

1. You have seven (7) days from the date of this notice to file a Notice of Intent to Request Redaction with the Court. A copy of the Notice of Intent to Request Redaction must be served upon the transcriber;

2. You have twenty−one (21) days from the date of the filing of the transcript to file a Request for Redaction of Transcript, listing the entries by page and line where personal data appears that should be redacted. A copy of the Request for Redaction of Transcript must be sent to the transcriber;

3. The deadline for filing the redacted version of the transcript is thirty−one (31) days from the filing date of the transcript;

4. If the redacted transcript is not filed, the transcript in its current form will be made available to the public via remote electronic access and at the public terminals in the Clerk's office for viewing and printing at the end of the ninety (90) day restricted period; and

5. If the redacted version of the transcript is filed, the redacted transcript will be made available via remote public access and at the public terminals in the Clerk's office for viewing and printing at the end of the ninety (90) day restricted period. The unredacted version of the transcript will not be available via remote electronic access or at the Clerk's office upon the filing of the redacted transcript; it shall be maintained as a private, restricted event. An attorney who purchases the transcript during the ninety (90) day restricted period will be given remote electronic access to the transcript and any redacted version filed.

Dated: 5/28/25

Mark A. Neal, Clerk of Court
by Deputy Clerk, Daniel Walston
301−344−3496

cc:

Clerk49 (rev. 09/28/2007)